UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

ERIC L. WINBUSH, et al.,                CIVIL ACTION
          Plaintiffs                    NO. CV07-0194-A

VERSUS

WILLIAM EARL HILTON, et al.,            JUDGE DEE D. DRELL
          Defendants                    MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed on February 2, 2007, pursuant to 42 U.S.C. § 1983, § 1988, and supplemental state law claims, and amended on December 12, 2007 (Doc. 41), by plaintiffs Eric L. Winbush, Jennifer N. Yancy, Sally T. Moore, Keisha D. Gipson, and Brandi N. Gipson.  Plaintiffs were patrons of Club Retro, a night club in Alexandria, Louisiana, in the early morning hours of February 5, 2006.

The named defendants are William Earl Hilton ("Hilton") (individually and in his official capacity as (then) Sheriff of Rapides Parish) and several Deputy Sheriffs of Rapides Parish, both individually and in their official capacities - Michael Slocum ("Slocum"), Ricky Doyle ("Doyle"), Michael LaCour ("LaCour"), James Rauls ("Rauls"), and John Does (agents, employees, and representatives of the Rapides Parish Sheriff, employed by Sheriff Hilton, who participated in the raid of Club Retro).

Plaintiffs contend in their complaints that, due to defendants' racial bias, Club Retro was targeted and raided by defendants in "Operation Retro-Fit."  Plaintiffs claim defendants made a warrantless search of Club Retro and its owners, employees, and patrons in the early morning hours of February 5, 2006, in an attempt to find evidence of illegal narcotics and other criminal activity.  Everyone in Club Retro had their identities checked and was searched for firearms and narcotics, and several cars parked at Club Retro were searched.  Plaintiffs allege violations of their Fourth Amendment rights against unreasonable searches and seizures, violations of their Fourth Amendment rights against the unreasonable use of force, verbal abuse, interference with their First Amendment rights of assembly, association, and expression, denial of Equal Protection, and state law claims for false arrest, false imprisonment, assault, and battery.  Plaintiffs propose in their complaint to make this suit a class action to incorporate all who were patrons of Club Retro on February 5, 2006.

For relief, plaintiffs ask for general and punitive damages, costs, and attorney fees.

Defendants answered the complaints (Docs. 8-12, 42) and filed a motion to dismiss (Docs. 16, 32, 43), to which plaintiffs filed briefs in opposition (Doc. 26, 48).  Defendants' motion to dismiss was referred to the undersigned Magistrate Judge for report and recommendation (Doc. 23).  Plaintiffs' motion for class

2

certification has been deferred pending a ruling on the motion to dismiss the claims of the named plaintiffs (Doc. 20).

<u>Law and Analysis</u>

<u>Motion to Dismiss and Qualified Immunity</u>

Defendants contend the court should grant their motion to dismiss because plaintiffs failed to state a claim on which relief may be granted and because defendants are entitled to qualified immunity in their individual capacities.

A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted. <u>Tanglewood East Homeowners v. Charles-Thomas, Inc.</u>, 849 F.2d 1568, 1572 (5th.Cir. 1988); <u>Doe v. U.S. Dept. of Justice</u>, 753 F.2d 1092, 1101 (D.C.Cir. 1985). For the purposes of such a motion, the factual allegations of the complaint must be taken as true, and any ambiguities must be resolved in favor of the pleader. <u>Doe</u>, 753 F.2d at 1101. A motion to dismiss an action for failure to state a claim admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts. <u>Crowe v. Henry</u>, 43 F.3d 198, 203 (5th Cir. 1995). In particular, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. <u>Hirras v. National Railroad Passenger Corp.</u>, 10 F.3d 1142, 1144 (5th Cir. 1994), vacated on other grounds, 512 U.S. 1231, 114

3

S.Ct. 2732, 129 L.Ed.2d 855 (1994); Doe, 753 F.2d at 1102.  On a motion to dismiss, it is presumed that general allegations embrace the specific facts that are necessary to support the claim. National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident.  Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).  Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law.  Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated.  Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice their conduct is unlawful.  Hope v. Pelzer,  536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

The defense of qualified immunity may be considered on a motion to dismiss.  In order to survive a motion to dismiss, a

plaintiff's allegations must portray an objectively unreasonable violation of a clearly established right.  Shipp, 199 F.3d at 261.

The first inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation.  Hope, 122 S.Ct. at 2513.  If it is established that the defendants participated in constitutionally impermissible conduct, the defendants may nevertheless be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Hope, 122 S.Ct. at 2515.  For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.   In the light of pre-existing law, the unlawfulness must be apparent.  However, officials can be on notice that their conduct violates established law even in novel factual circumstances.  The salient question the court must ask is whether the state of the law at the time of the alleged incident gave the officers fair warning that their alleged conduct was unconstitutional.  Hope, 122 S.Ct. at 2516.

The qualified immunity defense involves a shifting burden of proof.  The defendant official must initially plead his food faith and establish that he was acting within the scope of his discretionary authority.  Once the defendant has done so, the

burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  The Fifth Circuit does not require that an official demonstrate that he did not violate clearly established federal rights; that burden is upon plaintiffs. If a plaintiff states a valid claim, the plaintiff bears the burden of demonstrating the defendant's actions violated clearly established law.  Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992), and cases cited therein.

When a defendant raises the defense of qualified immunity, there are an array of procedures for the district court to follow. First, the district court must insist that a plaintiff suing a public official under Section 1983 file a short and plain statement of his complaint, a statement that rests on more than conclusions alone.  Second, the court may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity.  Vindicating the immunity doctrine will ordinarily require such a reply, and a district court's discretion not to do so is narrow indeed when greater detail might assist. The district court may ban discovery at this threshold pleading stage and may limit any necessary discovery to the defense of qualified immunity.  The district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity to raise a

genuine issue as to the illegality of defendant's conduct at the time of the alleged acts.  Even if such limited discovery is allowed, at its end, the court can again determine whether the case can proceed and consider any motions for summary judgment under Rule 56.  <u>Schultea v. Wood</u>, 47 F.3d 1427, 1433-1434 (5th Cir. 1995).

In the case at bar, plaintiffs were permitted to file a supplemental and amending complaint which provided additional facts, as well as a response to the motion to dismiss which addressed the qualified immunity defense.  Therefore, plaintiffs have been afforded opportunities to meet the heightened pleading requirement in this case.

<u>The Complaints</u>

Plaintiffs contend defendants violated their constitutional rights against unreasonable searches and seizures and false arrest, and were denied their First Amendment rights to freedom of assembly, association, and expression.

Plaintiffs allege in their amended complaint (Doc. 53) that, on February 5, 2006, at approximately 12:15 a.m., while they were present at Club Retro, a night club in Alexandria, Louisiana, Rapides Parish Sheriff's employees carried out "Operation Retro-Fit".  Plaintiffs allege that a team composed of over forty Rapides Parish Deputy Sheriffs and other officers, including defendants Hilton, Slocum, Rauls, Doyle, and LaCour, all heavily armed, some in full SWAT gear including black ski masks, burst into Club Retro

at gun point, and seized, searched, used excessive force against, threatened, and verbally abused the Club Retro patrons, employees and owners.  Plaintiffs contend the warrantless search and seizure lasted four to five hours, and resulted in violations of plaintiffs' constitutional rights (Doc. 53).

At the time of the raid, Eric Winbush was a 33 year old black man, who had not been consuming alcohol, was unarmed, and was present at Club Retro to listen to music and to "engage in expressive speech and conduct."  Winbush contends an unknown officer pointed a gun at him and fixed the red dot from the laser sight on him, he was detained at Club Retro until about 5:00 a.m., his hands were placed against a wall and his person and clothing were throughly searched, he was sniffed by police dogs twice, and he was warned that Club Retro would be raided again in the future, causing him to never return to Club Retro (Doc. 53).  Winbush contends he was terrified and publicly humiliated by the defendants' actions against him (Doc. 53).

At the time of the raid, Jennifer Yancy was an unarmed, 24 year old black woman who was at Club Retro to listen to music and "engage in expressive speech and conduct" (Doc. 53).  When the officers entered Club Retro, guns were pointed at Yancy's group, she was knocked to the floor then pushed against a wall, she was told she could not leave, was patted down by a male deputy and required to empty her pockets, and was sniffed by a police dog

(Doc. 53).  Yancy was terrified and publicly humiliated, and never
returned to Club Retro (Doc.53).

Sally Moore was an unarmed, 24 year old black woman who was
walking to the restroom at Club Retro when the raid commenced;
Moore was pushed away from the restroom, was told she could not
leave, was detained until about 4:00 a.m., was patted down by a
male deputy and required to empty her pockets, was sniffed by a
police dog, and was told Club Retro would be raided again any time
there was a big crowd (Doc. 53).  Moore was terrorized and
intimidated and never returned to Club Retro (Doc. 53).

Keisha Gipson was an unarmed, 30 year old black woman who was
at Club Retro when it was raided (Doc. 53).  A gun was pointed at
Keisha and the red dot from laser sight was fixed on her, she was
detained until about 3:00 a.m., she was patted down, required to
empty her pockets, and made to lift her shirt and "shake her bra"
to see if drugs fell out, then she was sniffed by a police dog, and
told when she left that it would be better for her if she did not
return to Club Retro (Doc. 533).

Brandi Gipson was an unarmed, 24 year old black woman who was
present during the raid of Club Retro (Doc. 53).  A gun was pointed
a Brandi and the red dot from the laser sight was fixed on her, she
was held until about 5:00 a.m., she was patted down and required to
empty her pockets, she was required to lift her shirt and "shake
her bra" to see is drugs fell out, and she was sniffed by a police

dog (Doc. 53).  Brandi heard a deputy tell everyone the police would be back to Club Retro next weekend; she never returned to Club Retro (Doc. 53).  Brandi alleges she was terrified and humiliated by the experience (Doc. 53).

Plaintiffs allege that "each plaintiff" had his or her constitutional rights violated by "each defendant" (in both their individual and official capacities) due to (1) unconstitutional seizure, (2) unconstitutional search, (3) objectively unreasonable use of force, (4) unconstitutional interference with right of assembly, association, and expression,  and (5) denial of equal protection of the law.  Plaintiffs further allege state law claims for false arrest/false imprisonment, assault, and battery.

Law as to Official Capacity Claims

Plaintiffs are suing Sheriff Hilton and Deputies Rauls, Slocum, LaCour, and Doyle in their official capacities.

### 1. Monell Claims

Official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.  Monell v. Dept. of Social Services, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); Brooks v. George County, Ms., 84 F.3d 157, 165 (5th Cir.), cert. den., 519 U.S. 948, 117 S.Ct. 359 (1996)("Brook's suit against Sheriff Howell in his official capacity is treated as a claim against George County"), citing Hafer v. Melo, 502 U.S. 21, 23-27, 112 S.Ct. 358,

361-362 (1991)("Suits against state officials in their official capacity therefore should be treated as suits against the State"). When officials sued in their official capacity in federal court die or leave office, their successors automatically assume their roles in the litigation. Because the real party in interest in official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law. For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses. Hafer, 502 U.S. at 25, 112 S.Ct. at 361-362.

## 2. Law Enforcement Districts

La. R.S. 33:9001 creates, in each parish except Orleans, a special district to be known as a law enforcement district for the purpose of providing financing to the office of sheriff for that parish. A deputy sheriff is an appointed public officer of his parish law enforcement district, of which the sheriff is the head. La.R.S. 33:1433, 33:9001.  Trahan v. Acadia Parish Sheriff's Office, 2006-1136 (La.App.3d Cir. 2/7/07), 950 So.2d 151, 154; Lewis v. Jefferson Parish Sheriff's Office, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251; City of Shreveport v. Caddo Parish, 27,519 (La.App. 2 Cir. 6/23/95), 658 So.2d 786, 794-795, writ den., 95-2285, 95-2298 (La. 11/27/1995) 663 So.2d 728, 729. La.R.S. 33:9001, et seq., empower the sheriff to raise revenues to

finance his facilities and services through the law enforcement district, whose corporate existence survives the term of office of any individual sheriff.[1] <u>Prator v. Caddo Parish</u>, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d 932, 936, aff'd in part, vac'd in other part, 2004-0794 (La. 12/1/04), 888 So.2d 812.

Therefore, a suit against Sheriff Hilton and the named deputy sheriffs in their official capacities is actually a suit against the Rapides Parish Law Enforcement District.[2] <u>Law Enforcement</u>

---

[1] La.R.S. 33:9001 states:
"There is hereby created, in each parish except Orleans, a special district to be known as a law enforcement district for the purpose of providing financing to the office of sheriff for that parish. In the parish of Orleans such a special district is hereby created for the purpose of providing financing to the office of criminal sheriff. The provisions of R.S. 33:9002, 9003(D), 9007, 9008, and 9010 shall apply to the district created in the parish of Orleans. No other provisions of this Chapter shall be applicable thereto. The boundaries of each district shall be coterminous with the boundaries of the parish and the duly elected sheriff of the parish or in the parish of Orleans, the criminal sheriff or his successor shall be ex officio the chief executive officer of the district."

As plaintiffs point out in their complaint, a new sheriff has been elected for Rapides Parish.  That will not affect the official capacity suit against Sheriff Hilton since a successor sheriff may be held liable in his official capacity for the torts for which his predecessor in office was liable in his official capacity.  <u>Riley v. Evangeline Parish Sheriff's Office</u>, 94-0202 (La. 4/4/94), 637 So.2d 395, citing <u>Jenkins v. Jefferson Parish Sheriff's Office</u>, 402 So.2d 669, 671 (La. 1981).  Also, <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 470 (5th Cir. 1999).

[2] The State of Louisiana grants no legal status to any "Parish Sheriff's Office."  Therefore, "Parish Sheriff's Departments" are not legal entities capable of  being sued. <u>Ruggiero v. Litchfield</u>, 700 F. Supp. 863, 865 (M.D.La. 1988); <u>Liberty Mut. Ins. Co. v. Grant Parish Sheriff's Dept.</u>,  350 So.2d 236, 238 (La. App., 3d Cir.), w.d., 352 So. 2d 235 (La. 1977). Also, <u>Riley v. Evangeline Parish Police Jury</u>, 630 So.2d 1314,

District of Parish of Avoyelles v. Avoyelles Parish Police Jury,
1998-996 (La. App. 3d Cir. 2/3/99), 736 So.2d 842, writ den., 1999-
635 (La. 4/23/99), 742 So.2d 892 (a Law Enforcement District is a
taxing entity and, for all practical purposes, a Law Enforcement
District is the Sheriff); La.R.S. 33:9001.   See also, Denham
Springs Economic Development Dist. v. All, 2004-1674 (La. 2/4/05),
894 So.2d 325, 332; Wood v. Fontenot, 2004-1174 (La. App. 3d Cir.
10/20/04), 885 SO.2d 668, writ den., 2004-2677 (La. 11/4/04), 885
So.2d 1117.   Since the Rapides Parish Law Enforcement District is
not entitled to qualified immunity, Owen v. City of Independence,
Mo., 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673
(1980), neither is Sheriff Hilton in his official capacity, Rodgers
v. Jabe, 43 F.3d 1082, 1089 (6th Cir. 1995); Ruehman v. Sheahan, 34
F.3d 525, 527 (7th Cir. 1994).

### 3. Customs and Policies

A plaintiff seeking to impose liability on a municipality
under Section 1983 is required to identify a municipal "policy" or
"custom" that caused the plaintiff's injury.   Locating a "policy"
ensures that a municipality is held liable only for those
deprivations resulting from the decisions of its duly constituted
legislative body or of those officials whose acts may fairly be

---

1320 (La. App. 3d Cir. 1993), rev'd on part on other grounds, 637
So.2d 395 (La. 1994); Ferguson v. Stephens, 623 So.2d 711, 714-15
(La. App. 4th Cir. 1993); Garner v. Avoyelles Parish Sheriff's
Dept., 511 So.2d 8 n.1 (La. App. 3d Cir. 1987).

said to be those of the municipality.  <u>Board of Cty. Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 1388 (1997).

In <u>Burge</u>, the Fifth Circuit explained that the official policy requirement may be met in at least three different ways: (1) when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy, (2) where no official policy was announced or promulgated but the action of the policymaker itself violated a constitutional right; and (3) even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.  <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 471 (5th Cir. 1999), and cases cited therein.

A custom or practice amounting to policy is demonstrated through proving a persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an

14

official to whom that body has delegated policy-making authority.
Johnson v. Deep East Tex. Regional Narcotics Trafficking Task
Force, 379 F.3d 293, 309 (5th Cir. 2004).

For a municipality to be liable on account of its policy, the
plaintiff must show, among other things, either (1) that the policy
itself violated federal law or authorized or directed the
deprivation of federal rights, or (2) that the policy was adopted
or maintained by the municipality's policymakers with deliberate
indifference as to its known or obvious consequences.  A showing of
simple or even heightened negligence will not suffice.  Johnson,
379 F.3d at 309.

## 4. Policymakers

Under Louisiana law, the sheriff is a final policymaker.
Craig v. St. Martin Parish Sheriff, 861 F.Supp. 1290, 1300 (W.D.La.
1994), citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the
chief law enforcement officer in the parish.").  Also, McNeese v.
State of Louisiana, 2006 WL 1751055 (W.D.La. 2006); Walker v.
Rinicker, 29,361 (La.App. 2d Cir. 9/6/96), 681 So.2d 1.  As the
chief executive officer for the Rapides Parish Law Enforcement
District, the Rapides Parish Sheriff is the independent and final
official policymaker for all of the law enforcement district.  A
deputy sheriff is an appointed public officer of his parish law
enforcement district, of which the sheriff is the head.  La.R.S.
33:1433, 33:9001.  Also, Lewis v. Jefferson Parish Sheriff's

<u>Office</u>, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251.
Deputy sheriffs are not policymakers for the Rapides Parish Sheriff
and the Rapides Parish Law Enforcement District.   Therefore, the
claims against Deputies Slocum, Doyle, LaCour and Rauls in their
official capacities should be dismissed.

### 5. Municipal Liability

Municipal liability under Section 1983 attaches where a
deliberate choice to follow a course of action is made from among
various alternatives by the official or officials responsible for
establishing final policy with respect to the subject matter in
question.   Therefore, municipal liability may attach to a *single
decision* to take unlawful action made by a municipal policymaker.
<u>Pembauer v. City of Cincinnati</u>, 475 U.S. 469, 483, 106 S.Ct. 1292,
1300 (1986).   Also, <u>Bd. of Cty. Comm'rs of Bryan County v. Brown</u>,
520 U.S. 397, 117 S.Ct. 1382 (1997); <u>Gelin v. Housing Authority of
New Orleans</u>, 456 F.3d 525, 527 (5th Cir. 2006).   Where action is
directed by those who establish governmental policy, the
municipality is equally responsible whether that action is to be
taken *only once* or to be taken repeatedly.   <u>Pembauer</u>, 475 U.S. at
481, 106 S.Ct. at 1299.

The plaintiff must also show that the municipal action was
taken with the requisite degree of culpability and must demonstrate
a direct causal link between the municipal action and the
deprivation of federal rights.   Accordingly, proof that a

16

municipality's authorized decision maker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  <u>Board of Cty. Comm'rs of Bryan Cty.</u>, 520 U.S. at 404, 117 S.Ct. at 1388-90.

The claims against Sheriff Hilton in his official capacity are discussed under separate topics below.

<u>Fourth Amendment Claims Against Defendants in Their Individual Capacities</u>

Plaintiffs are also suing each defendant in their individual capacities.  Plaintiffs allege that Sheriff Hilton and Deputies Rauls, Slocum, Doyle, and Lacour each participated in planning and supervising the raid on Club Retro, which resulted in violations of plaintiffs' constitutional rights against unreasonable searches and seizures.

In their motion to dismiss, defendants argue that (1) plaintiffs have not alleged specific acts of each defendant which show they individually participated in or witnessed the alleged violations of each plaintiff's civil rights, (2) plaintiffs did not have a reasonable expectation of privacy in Club Retro, (3) plaintiffs were subjected only to an investigatory stop pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868 (1968) and (4) plaintiffs were subject to being searched as authorized by La.R.S. 14:95.4. Defendants also contend they are entitled to qualified immunity in their individual capacities.

17

### 1. Supervisory Liability

First, defendants contend the claims against Sheriff Hilton in his individual capacity should be dismissed because the doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983.   Plaintiffs allege Sheriff Hilton authorized Operation Retro-Fit and the manner in which it was carried out, participated in the planning of Operation Retro-Fit, and was present during part of the raid, supervising officers on scene.

Plaintiffs also allege Sheriff Hilton is liable because he approved the raid on Club Retro, which was in accordance with his customs or policies.  Pursuant to those allegations, Sheriff Hilton may be held liable in both his individual and official capacities for any deprivations of plaintiffs' constitutional rights which causally resulted from the raid on Club Retro.

Therefore, plaintiffs do not appear to be relying on supervisory liability for their claims against Sheriff Hilton.

### 2. Bystander Defense

Plaintiffs allege the raid was planned on the authorization of and pursuant to the customs and/or policies of the deputies' employer, Sheriff Hilton.  Plaintiffs further allege the defendant deputies participated in planning, supervising, and carrying out Operation Retro-Fit.

In order to establish the personal liability of a certain

18

defendant to a plaintiff who is claiming damages for deprivation of his civil rights, that plaintiff must show that particular defendant's action or inaction was a violation of the plaintiff's civil rights. Reimer v. Smith, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981). Also, Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 1098 n. 7 (1986). Personal involvement is an essential element of a civil rights cause of action. Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983), cert. den., 464 U.S. 897, 104 S.Ct. 248 (1983). A plaintiff must show the actions or inactions of each named defendant caused the plaintiff to be deprived of his or her constitutional rights. Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598 (1976). Also, Huffman v. Linthicum, 2008 WL 341573, *2 (5th Cir. 2008).

As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability. A supervisory official's failure to supervise, control, or train an offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. Hall v. Shipley, 932 F.2d 1147, 1154 (6th Cir. 1991). Supervisory personnel are subject to liability where evidence establishes that they authorized or approved the unconstitutional conduct of the offending officers. Ghandi v. Police Dept. of City of Detroit, 747 F.2d 338 (6th Cir. 1984), and cases cited therein.

19

However, an officer's participation in a search precludes a finding that the officer was a mere bystander who is not liable for Fourth Amendment violations arising from the search.  Creamer v. Porter, 754 F.2d 1311 (5th Cir. 1985) (affirming dismissal from suit of a deputy who was only a bystander to a search and seizure). Also, James by James v. Sadler, 909 F.2d 834 (5th Cir. 1990).  In Creamer, the Fifth Circuit allowed a plaintiff to recover punitive damages against the police officer who supervised the search and seizure of plaintiff's residence, which constituted reckless disregard for plaintiff's Fourth Amendment rights.  Also, Estep v. Dallas Cty., Tex., 310 F.3d 353 (5th Cir. 2002)(officer on scene responsible for deciding whether a search could be lawfully conducted, who knew search was transpiring and allowed it to go forward, was not entitled to qualified immunity).  In Melear v. Spears, 862 F.2d 1177, 1186 (5th Cir. 1989), the Fifth Circuit found that an officer who stood armed at the door, while another officer performed an illegal search of an apartment, was an active, integral participant in the illegal search and was not entitled to qualified immunity.

Since Deputies Rauls, Slocum, Doyle, and Lacour planned Operation Retro-Fit, actively supervised the operation and the officers involved in the operation, and implemented the drug searches of the patrons, they may be held liable for constitutional violations which occurred during the operation, regardless of

20

whether they, themselves, actually searched each plaintiff in this case.

Therefore, defendants are not entitled to qualified immunity as bystanders to the searches of plaintiffs.

3. Justification for the Searches

Next, defendants contend plaintiffs claims should be dismissed because plaintiffs did not have a reasonable expectation of privacy while they were in Club Retro, citing Bond v. U.S., 529 U.S. 334, 120 S.Ct. 1462 (2000), contending plaintiffs were subjected only to an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, (1968) and were subject to being searched for firearms as authorized by La.R.S. 14:95.4.  Defendants contend plaintiffs were put on notice that they may be searched for firearms by signs posted at the entrance to Club Retro, and argue that women's purses were searched on entry into Club Retro, and that other signs warned patrons of the consequences of being caught with illegal drugs while on the premises.  Defendants also cite State v. Dobard, 2001-2629 (La. 6/21/02), 824 So.2d 1127, to uphold the legality of their searches.

The Supreme Court has consistently held that police must, whenever practicable, obtain advance judicial approval of a proposed search by obtaining a warrant based on probable cause. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507 (1967); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776 (1961).  The Fourth

Amendment, made applicable to the States by way of the Fourteenth Amendment, guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.  The Supreme Court has often stated that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.  Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S.Ct. 2130, 2135 (1993), and cases cited therein.  The exceptions include: (i) border searches for contraband and illegal aliens, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074 (1976); (ii) hot pursuit of an armed criminal suspect, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642 (1967); (iii) search incident to a lawful arrest, Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223 (1964); (iv) stop based on articulable suspicions and frisk for weapons, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968); (v) airport searches for weapons and explosives, United States v. Davis, 482 F.2d 893, 910 (9th Cir.1973); United States v. Moreno, 475 F.2d 44 (5th Cir. 1973), cert. denied, 414 U.S. 840, 94 S.Ct. 94 (1973); (vi) searches upon entering courthouse, Downing v. Kunzig, 454 F.2d 1230 (6th Cir.1972); (vii) search based upon consent, Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 (1973); and (viii) regulatory inspections pursuant to a statutory scheme, Colonnade Catering Corp. v. United States, 397 U.S. 72, 90

22

S.Ct. 774 (1970).   Therefore, defendants must establish their searches of plaintiffs fall within one of these exceptions.

In <u>Bond</u>, 529 U.S. at 338, 120 S.Ct. at 1465, the Supreme Court stated that a Fourth Amendment expectation of privacy analysis involves two questions: (1) whether the individual, by his conduct, has exhibited an actual expectation of privacy, and (2) whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.   In <u>Bond</u>, 529 U.S. at 338-339, 120 S.Ct. at 1465, the court found a border patrol agent's search of a bus passenger's carry-on bag violated the Fourth Amendment because Bond had a privacy expectation in the contents of his opaque carry-on luggage which was infringed on by the agent's probing tactile examination of the luggage.   Defendants contend plaintiffs were warned by the signs posted at Club Retro that they would be searched for firearms upon entering Club Retro and, therefore, plaintiffs did not have a reasonable expectation of privacy. However, the Louisiana Supreme Court stated in <u>Ringe v. Romero</u>, 624 F.Supp. 417, 420 (W.D.La. 1985), that society recognizes that individuals entering a public eating and drinking establishment retain a legitimate expectation of privacy as to their persons, as well as to their possession, that excludes the possibility of a personal search.   Therefore, defendants' argument that plaintiffs did not have a reasonable expectation of privacy is meritless, at least as it pertains to the searches of plaintiffs for drugs.

23

Defendants further argue their searches were justified under Terry v. Ohio.  In Terry, the Supreme Court held that, where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions.  Minnesota v. Dickerson, 508 U.S. 366, 373, 113 S.Ct. 2130, 2135-2136 (1993).  Terry further held that, when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon.  The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.  A protective search - permitted without a warrant and on the basis of reasonable suspicion less than probable cause - must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.  If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed.  Minnesota v. Dickerson, 508 U.S. at 373, 113 S.Ct. at 2136.  Also, U.S. v. Reyes, 349 F.3d 219, 224 (5th Cir. 2003), 540

24

U.S. 1228, 124 S.Ct. 1528 (2004).  These principles were settled forty years ago, when the Supreme Court announced it's decision in Terry and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889 (1968).  Therefore, this court must examine whether the searches for weapons and drugs, including the contents of pockets and under the shirts and bras of the female plaintiffs, were objectively reasonable under clearly established law.

        In Ybarra v. Illinois, 444 U.S. 85, 92-94, 100 S.Ct. 338, 343-344 (1979), the police had a warrant to search the premises of the Aurora Tap Tavern and its proprietor.  However, when they executed the search warrant, the police also searched the customers of the tavern.  The Supreme Court stated that every patron who entered the Aurora Tap Tavern was clothed with constitutional protection against an unreasonable search or seizure, and held that, where the State was unable to articulate any specific facts that would have justified the officers in suspecting patron Ybarra was armed and dangerous, the pat down of Ybarra violated the Fourth Amendment.  The Supreme Court in Ybarra further explained that, under the Terry exception to the requirement of probable cause, a law enforcement officer, for his own protection and safety, may conduct a pat down to fine weapons that he reasonable believes or suspects are then in the possession of the person he has accosted.  However, nothing in Terry can be understood to allow a generalized search for weapons or a search for anything but weapons, and Terry

does not allow a frisk for weapons on less than reasonable belief
or suspicion directed at the person to be frisked, even through
that person happens to be on premises where an authorized narcotics
search is taking place.  Ybarra, 444 U.S. at, 100 S.Ct. at.  A
person's mere propinquity to others independently suspected of
criminal activity does not, without more, give rise to probable
cause to search that person.  Ybarra, 444 U.S. at 81, 100 S.Ct. at
342, citing Sibron v. New York, 392 U.S. 40, 62-63, 88 S.CT. 1889,
1902 (1968).  See also, United States v. Di Re, 332 U.S. 581, 583-
587, 68 S.Ct. 222, 223-225 (1948)(the court held unconstitutional
a search of passengers in a vehicle driven by a person the police
had probable cause to believe had committed a crime, holding the
passengers' mere presence in the suspect's car did not create
probable cause to search the passengers); Williams v. Kaufman Cty.,
352 F.3d 994, 1006 (5th Cir. 2003) (execution by forty officers of
arrest warrant for five named individuals, in a nightclub, where
deputies detained and strip searched 100 other people without
individualized reasonable suspicion or probable cause, because they
were in the nightclub at the time of the raid, violated their
constitutional rights and awards of punitive damages were upheld).

    The Sixth Circuit dealt with a similar situation in Russo v.
Massullo, 927 F.2d 605 (6th Cir.), cert. den., 502 U.S. 829, 112
S.Ct. 80 (1991).   In Russo, in order to serve notices of
noncompliance with state liquor laws and to seize two illegal

gambling machines, and without a warrant, seven to ten officers entered a restaurant/lounge with guns drawn, pointed their weapons at the persons inside, and ordered everyone in the establishment to raise their hands over their heads.  Everyone was subjected to a pat-down search, then allowed to leave after they were searched.  The raid lasted two hours.  The Sixth Circuit noted that, since the liquor industry is a pervasively regulated industry, a legislative body can provide for a warrantless administrative inspection of liquor establishments, but held the officers exceeded the scope of an administrative search.  Russo, 928 F.2d at *4, citing Colonnade Catering, 397 U.S. at 77, 90 S.Ct. at 777.  The court further held that authority to search a tavern does not give accompanying authority to search persons inside the tavern absent a reasonable belief that the particular person searched was involved in criminal activity or was dangerous.  Russo, 927 F.2d at *4, citing Ybarra.

In a contrasting situation, in Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999), the Eleventh Circuit upheld a warrantless administrative two-hour search of a nightclub where an agent of the Georgia Department of Revenue, with the aid of forty law enforcement officers and accompanied by local news media, executed valid, previously obtained arrest warrants for the owners of the bar, checked the identifications of the approximately 400 patrons for underage sales of alcohol, and searched for violations of the Georgia laws relating to alcohol sales; no weapons were ever drawn,

27

no one was threatened, the patrons were not physically touched and were allowed to leave after their identification was checked, all within two hours, and the court noted that inspection of patron's identifications may occur in the context of a valid, warrantless administrative search.

In the case at bar, the officers did not have a warrant to search Club Retro or it's owners and employees.  They claim they were making a warrantless administrative search to look for illegal alcohol sales to minors, to determine whether Club Retro was exceeding maximum patron capacity as established by the Fire Marshal, and to check whether any of the patrons were underage (although the primary stated purpose of "Operation Retro-Fit" (Doc. Item 1, Ex.; Doc. Item 53, Ex.) was to investigate suspected illegal narcotics sales).  The defendants contend they were conducting Terry frisks of the patrons for weapons, but have alleged no individualized, articulable reasons to show why they suspected each plaintiff was presently armed.

Moreover, the circumstances do not indicate that a Terry stop and frisk took place.  The stated mission of Operation of Retro-Fit was to search for drugs, and the searches conducted by the officers clearly indicated they were looking for drugs as well as weapons.

However, defendants further contend they did not need individualized suspicion because each plaintiff (and every other patron of Club Retro) implicitly consented to a firearms search

when they entered Club Retro, pursuant to La.R.S. 14:95.4, which provides for general consent to a weapons search by all patrons in any establishment which serves alcohol.

While at least one Louisiana court has upheld a weapons pat down of a bar patron pursuant to the dictates of La. R.S. 14:95.4A, in order to dispel the possibility that the patron was armed, that court noted that, even in the absence of a specific statute automatically deeming patrons to have consented to a reasonable search, the right of law enforcement officers to briefly frisk for weapons during the course of an investigation is justified *if* a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.  State v. Scott, 561 So.2d 170, 174 (La.App. 1st Cir.), writ denied, 566 So.2d 394 (La. 1990).  See also, State v. Jackson, 2000-2202 (La. App. 1st Cir. 6/22/01), 809 So.2d 198, writ den., 2001-1990 (La. 6/7/02), 817 So.2d 1145.  In such circumstances, due weight must be applied to the specific reasonable inferences which the officer is entitled to draw from the facts in light of his experiences. Terry, 392 U.S. at 27, 88 S.Ct. at 1883.

La.R.S. 14:95.4 states in pertinent part:

"A. Any person entering an alcoholic beverage outlet as defined herein, by the fact of such entering, shall be deemed to have consented to a reasonable search of his person for any firearm by a law enforcement officer or other person vested with police power, without the necessity of a warrant.

"B. For purposes of this Section, "alcoholic beverage

outlet" means any commercial establishment in which alcoholic beverages of either high or low alcoholic content are sold in individual servings for consumption on the premises, whether or not such sales are the primary purpose or are n incidental purpose of the business of the establishment.

      \*     \*     \*

"E. The owner of the alcoholic beverage outlet shall post a sign, at or near the entrance, that states that by the fact of entering these premises p person shall be deemed to have consented to a reasonable search of his person for any firearm by a law enforcement officer or other person vested with police power, without the necessity of a warrant."

La.R.S. 14:95.4(A) has been held facially unconstitutional by a federal court in the Western District of Louisiana. <u>Ringe v. Romero</u>, 624 F.Supp. 417, 425 (W.D.La. 1985). The court in <u>Ringe</u> found the defendant failed to prove the warrantless search conducted pursuant to La.R.S. 14:95.4 fit within one of the established exceptions to the warrant requirement. Since <u>Ringe</u>, only one published Louisiana court opinion has applied the statute, without mentioning <u>Ringe</u>. Although <u>Ringe</u> is not binding precedent for this court, <u>Threadgill v. Armstrong World Ind., Inc.</u>, 928 F.2d 1366 (3d Cir. 1991); <u>State Farm Mutual Automobile Insurance Co. v. Bates</u>, 542 F.Supp. 807, 816 (N.D.Ga.1982), its reasoning appears sound.

La.R.S. 14:95.4 does not fit within any of the established exceptions to the warrant requirement and, therefore, is facially unconstitutional. As the court stated in <u>Ringe</u>, although society is prepared to recognize that an individual's expectation of

privacy upon entering a "public" eating and drinking establishment is necessarily lower than it would be in his own home, society would also be prepared to recognize that it is not diminished to the point where a body search, or pat down, would be within his reasonable expectation. Ringe, 624 F.Supp. at 420.

Moreover, the fact that the decision of which establishments serving liquor, and which individuals within those establishments, will be searched is left entirely within the discretion of the police officers militates in favor of finding the searches they authorize are particularly intrusive.  Ringe, 624 F.Supp. at 421, and cases cited therein.  There is no "public necessity" for the weapons searches permitted by La.R.S. 14:95.4 equivalent to that justifying national concerns such as the foreign policy implicated by hijackings or the threat to the judicial system implicated by courthouse bombings, which would excuse waiving the requirement of individualized suspicion.  Ringe, 624 F.Supp. at 422.  Finally, pat down searches of large numbers of people are not the most efficacious, or least intrusive, means to search for firearms. Means such as the magnetometers, and the like, used in courthouses and airports are effective and relatively non-intrusive, although pat downs would certainly be effective in establishments where they are regularly enforced.  Ringe, 624 F.Supp. at 423.  Thus, every patron of every establishment in Louisiana that serves liquor for individual consumption (tavern, restaurant, sports arena, etc.) is

31

not constitutionally subjected to a search upon entering that establishment.  Ringe, 624 F.Supp. at 420.

Finally, in State v. Dobard, 2001-2629 (La. 6/21/02), 824 So.2d 1127, 1130, the Louisiana Supreme Court upheld the right of police officers to accept a general public invitation to enter a public tavern during its normal business hours.  See also, Mendoza v. I.N.S., 559 F.Supp. 842, 847 (W.D.Tex. 1982).[3]  The court in Dobard stated in dicta that, although La.R.S. 14:95.4 authorizes officers to check patrons of alcoholic beverage outlets for firearms, it *does not* authorize them to search the patrons for narcotics.  However, in the case at bar, the primary stated purpose of "Operation Retro-Fit" was to search for illegal drugs, which clearly exceeded the weapons search authorized by La.R.S. 14:95.4.  Thus, under Dobard, the defendants' search of plaintiffs for narcotics was unconstitutional.[4]

Since defendants' actions, as alleged by plaintiffs, were

---

[3] In Mendoza, the court held (consistent with the Louisiana court's holding in Dobard) that occupants of the bars entered by INS agents had no reasonable expectation of privacy insofar as the presence of the officers in the bar was concerned, so the officers did not need a warrant to enter the premises.  However, the court rejected the dragnet search and seizure employed by the officer, holding the officers needed a warrant to detain the occupants of the bars since the nature of their search required detention of people as to whom they had no individualized reasonable suspicion of illegal alienage.

[4] Moreover, defendants' activities in requiring female patrons to lift their shirts and shake out their bras are particularly suspect, given that the male patrons were, apparently, not likewise required to lift their shirts.

objectively unreasonable in light of well-established Fourth Amendment law, the defendants are not entitled to qualified immunity in their individual capacities.  Defendants' motion to dismiss the claims against Hilton, Slocum, Doyle, Lacour, and Rauls in their individual capacities should be denied.

<u>Fourth Amendment Claims Against Sheriff Hilton in His Official Capacity</u>

Plaintiffs allege Sheriff Hilton authorized Operation Retro-Fit and the manner in which it was carried out, participated in planning it, was present during parts of the raid, and supervised officers on scene.  Plaintiffs contend that Operation Retro-Fit was implemented and carried out according to the policy and custom of Sheriff Hilton[5] (Doc. Item 53), but have not identified a specific official policy or custom.

A stated above, the official policy requirement may be met in at least three different ways: (1) when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy, (2) where no official policy was announced or promulgated but the action of the policymaker itself violated a constitutional right; or (3) even when the policymaker fails to act

---

[5] Plaintiffs also allege the raid was carried out in accordance with the policies of Deputies Slocum, Doyle, LaCour, and Rauls.  However, as discussed above, the deputies do not establish policy for the Rapides Parish Law Enforcement District.

affirmatively at all, if the need to take some action to control the agents of the local governmental entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.  Burge, 187 F.3d at 471, and cases cited therein.

Plaintiffs allege that Sheriff Hilton authorized and supervised warrantless searches of their persons for firearms and drugs; that allegation falls under number two above - the action of the policymaker violated plaintiffs' constitutional rights. Sheriff Hilton's decision, as a municipal policymaker, to take unlawful action is sufficient to state a claim against Sheriff Hilton in his official capacity.  See Pembauer v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299 (1986)("Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken *only once* or to be taken repeatedly.").  Therefore, accepting plaintiffs' allegations as true for purposes of this motion, plaintiffs have stated claims against Sheriff Hilton in his official capacity for violations of their Fourth Amendment rights.

As noted above, Sheriff Hilton is not entitled to qualified immunity in his official capacity.  Accordingly, defendants' motion to dismiss plaintiffs' Fourth Amendment claims should be denied as to the claims against Sheriff Hilton in his official capacity.

Verbal Abuse

Plaintiffs contend they had to listen to profanities and racial slurs used by the officers raiding Club Retro.  However, plaintiffs have not alleged specifically what was said by any of the named defendants, nor have they alleged that any of the comments were directed toward them personally.

In order to establish the personal liability of a certain defendant to a plaintiff who is claiming damages for deprivation of his civil rights, that plaintiff must show that particular defendant's action or inaction was a violation of the plaintiff's civil rights.  Reimer v. Smith, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981).  Also, Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 1098 n. 7 (1986).  Therefore, plaintiffs' failure to allege that any of the named defendants verbally abused them fails to allege a claim against the named defendants.

Moreover, mere verbal threats or verbal harassment, standing alone, are not actionable under §1983 as a violation of constitutional rights.[6]  Bender v. Brumley, 1 F.3d 271, 274 n.4

---

[6] Racial epithets that accompany harassment or some other violation of constitutional rights may amount to a separate equal protection violation, Williams v. Kaufman Cty., 352 F.3d 994, 1012 (5th Cir. 2003), citing Williams v. Bramer, 180 F.3d 699, 706 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999), and may be is strong evidence that a comment or action is racially motivated.  The question in the equal protection context, however, is not just whether the conduct is racially motivated, but also whether that action deprives a person of equal protection of the laws.  Where the conduct at issue consists solely of speech, there is no equal protection

(5th Cir. 1993), citing <u>McFadden v. Luca</u>, 713 F.2d 143, 146 (5th Cir.), cert. den., 464 U.S. 998, 104 S.Ct. 499 (1983).  Although plaintiffs contend they were intimidated into not returning to Club Retro for the concert the next weekend, plaintiffs have not alleged that any of the named defendants said anything to them personally. In fact, plaintiffs  only allege a racial slur made against the wife of one of the owners of Club Retro, and not against plaintiffs themselves.  Finally, plaintiffs concede that, although defendants' "threatening language" may not constitute a claim, they allege it is evidence supporting their excessive force claim, their First Amendment claim, and their Equal Protection claim.  Therefore, plaintiffs' allegations of verbal abuse will be considered in the context of the other claims.

Since plaintiffs' allegations of verbal abuse do not, standing alone, constitute a Section 1983 claim, defendants' motion to dismiss should be granted on this issue and plaintiffs' claims against defendants for verbal abuse should be dismissed with prejudice.

<u>Excessive Force</u>

Defendants also move to dismiss plaintiffs' claims for use of excessive force.  Plaintiffs' claims for "excessive force" relate

---

violation.  <u>Williams</u>, 180 F.3d at 706.  Also, <u>Martin v. City of San Antonio</u>, 2006 WL 2062283 (W.D.Tex. 2006).  In the case at bar, plaintiffs have not alleged that any of the named defendants used racial epithets.

to the manner in which the raid was carried out.  Plaintiffs have not alleged any physical injuries, and they have not asked for damages due to physical injuries.

To state a Section 1983 claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996).  The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed. Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001); Williams v. Bramer, 180 F.3d 699, 703-704 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999).

Since plaintiffs have not alleged the use of excessive force which caused an injury, they have not stated a Section 1983 claim for use of excessive force.  Therefore, defendants' motion to dismiss plaintiffs excessive force claims should be granted and plaintiffs' claims for the use of excessive or unreasonable force should be dismissed with prejudice.

First Amendment Rights of Assembly, Association, and Expression

Next, defendants move to dismiss plaintiffs' claims that defendants interfered with their First Amendment rights of assembly, association, and expression.

The First Amendment provides that "Congress shall make no law

37

respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I.   Although freedom of expressive association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition.  Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338 (1972).

The First Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, prohibits a state, as sovereign, from abridging an individual's right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends, Boys Scouts of America v. Dale, 530 U.S. 640, 647, 120 S.Ct. 2446 (2000), and from denying an individual citizen rights and privileges solely because of his association with an unpopular organization.  Guilt by association alone, without establishing that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights.  Healy, 408 U.S. at 186.

There are two different sorts of "freedom of association" protected by the United States Constitution: (1) choices to enter into and maintain certain intimate human relationships are secured against undue intrusion by the state and receive protection as a fundamental element of personal liberty, and (2) a right to

38

associate for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion. <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 23, 109 S.Ct. 1591, 1594 (1989), citing <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 103 S.Ct. 3244 (1984). The right of private association protects the choice of individuals and organizations to enter into and maintain certain intimate human relationships against undue intrusion by the States. <u>Louisiana Debating and Literary Ass'n v. City of New Orleans</u>, 42 F.3d 1483 (5th Cir.), cert. den., 515 U.S. 1145, 115 S.Ct. 2583 (1995).

The personal associations that are entitled to constitutional protection are those that are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship; these types of relationships, such as family relationships, are distinctively personal aspects of one's life. Conversely, an association lacking these qualities, such as a large business enterprise, is remote from the concerns giving rise to this constitutional protection. <u>Roberts</u>, 468 U.S. at 619, 104 S.Ct. at 3250-3251.

In <u>Stanglin</u>, the Supreme Court held that dance hall patrons are not engaged in the sort of "intimate human relationships" referred to in <u>Roberts</u>, and do not engage in a form of expressive

39

activity protected the First Amendment.  The Supreme Court explained that the dance hall patrons were not members of any organized association, but instead were simply patrons of the same business establishment, most were strangers to one another, and anyone willing to pay the admission fee was admitted.  Although "freedom of speech" means more than simply the right to talk and to write, it is possible to find some kernel of expression in almost every activity a person undertakes, but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.  Therefore, the court held that the activity of dance-hall patrons coming together to engage in recreational dancing is not protected by the First Amendment since that activity does not qualify as either a form of "intimate expression" or a form of "expressive association."  The Constitution does not recognize a general right of "social association" that includes chance encounters in dance halls. Stanglin, 490 U.S. at 24-25, 109 S.Ct. at 1594-1595.  See also, Wallace v. Texas Tech Univ., 80 F.3d 1042 (5th Cir. 1996); Benigni v. City of Hemet, 879 F.2d 473 (9th Cir. 1988); Jammin Entertainment Complex v. City of New York, 2007 WL 2292998 (E.D.N.Y. 2007).  In Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th Cir. 1995), the court held that a public bar owner's relationships with his/her patrons and employees are not the sort of relationships protected by the First Amendment.

Since, as explained above, the right to gather socially in a

40

club to listen to music and dance is not protected by the Constitution, plaintiffs have not stated a claim cognizable under Section 1983.  Defendants' motion to dismiss plaintiffs' First Amendment claims should be granted and plaintiffs' First Amendment claims should be dismissed with prejudice.

Equal Protection Claims

Defendants' argue plaintiffs' Equal Protection claims should be dismissed because they have not sufficiently alleged they were subject to racial discrimination.  Plaintiffs contend they were "exposed to unfair application of the laws based on race or association" because defendants' conduct had a "discriminatory intent directed at plaintiffs' race and chosen association."

The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. Brennan v. Stewart, 834 F.2d 1248, 1257 (5th Cir. 1988), citing City of Cleburne, Tx. V. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249 (1985).  A deprivation of liberty or property is not required to prove a violation of the Equal Protection Clause.  A violation of equal protection occurs only when the government treats someone differently than others similarly situated; if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action - even if irrational - does not deny them equal protection of the laws.  Brennan, 834 F.2d at 1257.  To state a claim of racial

41

discrimination under the Equal Protection Clause, a plaintiff must allege that the government treats him differently than others similarly situated, prove that the governmental official was motivated by intentional discrimination on the basis of race, and demonstrate intentional discrimination.  Coleman v. Houston Independent School Dist.. 113 F.3d 528, 533 (5th Cir. 1997). Invidious discriminatory animus is the sine qua non of a constitutional claim of racial discrimination.  Coleman, 113 F.3d at 534.  The discriminatory intent of one official my not be imputed to another for purposes of imposing individual liability under the civil rights laws.  Only the direct acts of omissions of government officials, not the acts of subordinates, will give rise to individual liability under Section 1983.  Coleman, 113 F.3d at 534.  Therefore, the law as to Equal Protection rights was well-settled in this circuit at the time of the 2006 events in Club Retro.

Plaintiffs argue that a similarly situated nearby night club has never been targeted and raided by the Sheriff, and further allege Club Retro was targeted by the defendants due to the fact that it encouraged people of all races to visit, as well as the fact that the owners were Creole and one of the owners is in a mixed race marriage.  However, those allegations only tend to show discrimination against the owners of Club Retro - not discrimination directed toward the plaintiffs.  In fact, plaintiffs

only allege the laws were applied unfairly to Club Retro and its owners.

Regardless of whether plaintiffs witnessed a discriminatory act directed at Club Retro and its owners, and regardless of whether the owners were of the same race as the plaintiffs, plaintiffs do not have standing to raise a claim of discrimination against others in the absence of any direct injury to themselves. Questions of injury to the general public, in the constitutional sense, are not to be resolved by the judiciary. <u>Finch v. Miss. state Medical Ass'n, Inc.</u>, 585 F.2d 765, 771, 775-776 (5th Cir. 1978), modified on other grounds, 594 F.2d 163 (1979).

Since plaintiffs lack standing to assert this claim, defendants' motion to dismiss plaintiffs' Equal Protection Claim should be granted.

<u>State Law Claims</u>

Plaintiffs also allege state law claims for false arrest, false imprisonment, assault, and battery.

1.

Louisiana state law recognizes the tort of false arrest, also known as false imprisonment. <u>Alvarado v. Poche</u>, 2002-2 (La. App. 3d Cir. 6/5/02), 819 So.2d 1150, 1152, writ den., 2002-2212 (La. 11/8/02), 828 So.2d 1120. In order for a plaintiff to recover for false arrest, he must prove that he was unlawfully detained by the police against his will without a warrant or other statutory

43

authority.  Simply stated, it is restraint without color of legal authority.  Kyle v. City of New Orleans, 353 So.2d 969, 971 (La. 1977).  Thus, two elements are required to prove a case in false arrest and imprisonment: (1) detention of a person, and (2) unlawfulness of the detention.  Dumas v. City of New Orleans, 2001-0448 (La.App. 4 Cir. 12/05/01), 803 So.2d 1001, 1003, writ den., 2002-0024 (La. 3/15/02), 811 So.2d 912, citing  Harrison v. State Through Dept. of Public Safety and Corrections, 97-1086 (La. 12/1/98), 721 So.2d 458, 461; Hughes v. Gulf International, 593 So.2d 776, 780 (La. App. 4th Cir. 1992), writ den., 595 So.2d 658 (La. 1992).  If police officers act pursuant to statutory authority when they arrest and incarcerate a citizen, they are not liable to damages for false arrest and imprisonment.  As long as the officers reasonable believed the statute upon which they relied was valid at the time they acted, the law exempts the officers from liability even if the statute is later declared unconstitutional.  Cooks v. Rodenbeck, 1997-1389 (La.App. 3d Cir. 4/29/98), 711 So.2d 444, 447, citing Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977).

In the case at bar, defendants contend they conducted Terry stops of the plaintiffs, or stops so they could check their identifications and search them for firearms in accordance with La.R.S. 14:95.4.  While an arrest requires probable cause, an investigatory stop requires only the lesser standard of reasonable suspicion.  An investigatory stop, like an arrest, is a complete

44

restriction of movement, but for a shorter period of time.  State
v. Manning, 2003-1982 (La. 10/19/04), 885 So.2d 1044, 1074, cert.
den., 544 U.S. 967, 125 S.Ct. 1745 (1005).  As discussed above, the
defendants' investigatory stops of plaintiffs were not Terry stops
because they did not have individualized reasonable suspicion to
believe plaintiffs were engaged in criminal activity, nor were they
able to justify the pat downs with individualized reason suspicion
to believe the plaintiffs were presently armed and dangerous.
Therefore, the court must consider whether the detentions were
lawful under La.R.S. 14:95.4.

        Defendants detained and searched plaintiffs, at least in part,
for firearms and identification checks.  Whether or not La.R.S.
14:95.4 is unconstitutional is irrelevant since, in this case, the
police acted in good faith pursuant to a statute they reasonably
believed was valid.  Since the police at least purportedly had the
authority to detain plaintiffs to search for firearms, and
certainly had the authority to check identifications for underage
patrons, defendants lawfully detained the plaintiffs.[7]

        However, a stop that continues indefinitely will at some point
no longer be justified as an investigatory stop.  In determining
whether   a   detention   is   too   lengthy   to   be   considered   an

---

        [7] Of course, the lawfulness of the detentions is an issue
that is separate and distinguishable from the issues as to the
constitutionality of the searches which were conducted while
plaintiffs were detained.

investigatory stop, the courts must examine whether the police diligently pursed a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.  State v. Burciaga, 05-357 (La. App. 5th Cir. 2/27/06), 924 So.2d 1125, citing U.S. v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568 (1985).

In the case at bar, defendants have not claimed they had reasonable cause to arrest the plaintiffs.  See Harrison v. State, Department of Public Safety and Corrections, 1997-1086 (La. 12/1/98), 721 So.2d 458, 461.  Therefore, if the detentions amounted to arrests, the detentions were unlawful.

Plaintiffs were detained two to four hours.  Since there were approximately forty officers conducting identification checks and firearms searches of several hundred persons, the detentions were lengthy.  Although plaintiffs were not free to move around while the police were going about their business in the Club Retro and their detentions were lengthy due to the large number of people that needed to be checked by the police, they were able to leave as soon as their identifications were checked and they were searched. Moreover, pointing a weapon at the subject of an investigatory detention does not automatically convert an investigatory detention into an arrest.  U.S. v. Campbell, 178 F.3d 345, 349 (5th Cir. 1999).  Also, Fritz v. City of Corrigan, 163 F.Supp.2d 639, 644 (E.D.Tex. 2001).

Therefore, plaintiffs have not shown that their detentions amounted to arrests.  Contrast <u>Williams v. Kaufman Cty.</u>, 352 F.3d at 1009 (detentions of night club patrons for three hours amounted to arrests where patrons were handcuffed and strip searched *after* they were checked for contraband and weapons); <u>Heitschmidt v. City of Houston</u>, 161 F.3d 834 (5th Cir. 1998) (plaintiff's detention amounted to an arrest where he was publicly handcuffed and detained four hours while police searched his residence).  Since plaintiffs were not arrested, they have not stated claims for false arrest/false imprisonment.  Defendants' motion to dismiss these claims should be granted and plaintiffs' state law claims for false arrest/false imprisonment should be dismissed with prejudice.

2.

Finally, plaintiffs allege state law claims of assault and battery.  Plaintiffs claim that defendants' acts of false arrest and imprisonment constitute assault and battery under Louisiana law.  However, since plaintiffs were not falsely arrested and imprisoned, this argument is meritless.  Moreover, contrary to plaintiffs' contention, false arrest/false imprisonment do not necessarily constitute assault or battery.[8]

---

[8] A battery is the intentional use of force or violence upon another person or the intentional placing of another in reasonable apprehension of receiving a battery.  La.R.S. 14:33. An essential element of battery is physical contact, whether injurious or merely offensive, and may be committed by touching another through the clothing.  <u>State v. Schenck</u>, 513 So.2d 1159 (La. 1987).  An assault is an attempt to commit a battery, or the

47

Therefore, defendants' motion to dismiss plaintiffs' claims for assault and battery should also be granted and plaintiffs claims should be dismissed with prejudice.

John and Jane Does

Finally, plaintiffs name as defendants "about twenty John and Jane Does." Plaintiffs have never amended their complaint to name these purported defendants, and have never effected service on them. Therefore, the complaint against John and Jane Does employed by the Rapides Parish Sheriff should be dismissed without prejudice under Fed.R.Civ.P. 4 (m). See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988). In the alternative, plaintiffs claims against John and

---

intentional placing of another in reasonable apprehension fo receiving a battery. La.R.S. 14:36. The elements of assault are an intent to scare mental element, conduct by defendant of the sort to arouse reasonable apprehension of bodily harm, and the resulting apprehension on the part of the victim. State v. Blaise, 504 So.2d 1092 (La.App. 5th Cir. 1987). An assault occurs where one person threatens another and the threatening person has the present ability to carry out those threats so that the person threatened is placed in reasonable apprehension of receiving an injury. Johnson v. English, 34,322 (La. 5th Cir. 12/20/2000), 779 So.2d 876, 880. When examining claims for assault and battery, officers' conduct in effecting an arrest must be measured by standard negligent tort theories pursuant to La.C.C. art. 2315. LaBauve v. State, 618 So.2d 1187 (La. App. 3d Cir.), writ den., 624 SO.2d 1235 (La. 1993). A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers. Cloy v. Lee, 01-920 (La. App. 5th Cir. 1/15/02), 807 So.2d 900.

Jane Does should be dismissed for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure as interpreted by the Court and the Court's inherent power to control its own docket.  Link v. Wabash Railroad Company, 370 U.S. 626, 630-33, 82 S.Ct. 1386, 1389-90, 8 L.Ed.2d 734 (1962); Rogers v. Kroger Company, 669 F.2d 317, 319-20 (5th Cir. 1983).

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion to dismiss be GRANTED as to the official capacity claims against Rauls, Slocum, Doyle, and Lacour, and that plaintiffs' official capacity claims against them be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' Fourth Amendment claims be DENIED as to Sheriff Hilton in his official capacity, GRANTED as to Rauls, Slocum, Doyle, and LaCour in their official capacities, and DENIED as to Sheriff Hilton, Rauls, Slocum, Doyle, and LaCour in their individual capacities.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' claims of verbal abuse should be GRANTED and that plaintiffs' claims against defendants for verbal abuse should be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' excessive force claims should be GRANTED and

49

plaintiffs' claims for the use of excessive or unreasonable force should be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' First Amendment claims should be GRANTED and that plaintiffs' First Amendment claims should be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' Equal Protection claims should be GRANTED and that plaintiffs' Equal Protection claims should be DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that defendants' motion to dismiss plaintiffs' supplemental state law claims for false arrest/false imprisonment, assault, and battery be GRANTED and that plaintiffs' state law claims be DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER RECOMMENDED that plaintiffs' claims against "John and Jane Does" employed by the Rapides Parish Sheriff be DISMISSED WITHOUT PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District

Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 2nd day of June, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE